is number 18-1051 Lech v. Jackson. Counsel, when you're ready, please make your appellant. Rachel Maxim for the plaintiff appellant. Please proceed. I'd like to reserve a couple of minutes for rebuttal, if possible. Good morning. If it pleases the court, this case strikes the very heart of the purpose of the Fifth Amendment takings clause, as the U.S. Supreme Court stated in Armstrong v. U.S., quote, The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar government from forcing some people alone to bear public burdens, which in all fairness and justice should be borne by the public as a whole. This is a foundational principle of our modern jurisprudence in Fifth Amendment cases. It underpins all the cases that we all know so well concerning Fifth Amendment takings law, like Keogh v. New London. Here, the Lechs have been unquestionably forced to bear the entire burden of actions taken by the police for the benefit of the public as a whole. Their home was destroyed, and they alone had to bear the cost of that decision by the police to destroy a home because they thought it was necessary to apprehend a hiding suspect who took refuge in the home to evade capture. This decision was made by one police officer alone, based on his sole discretion that destroying a home was necessary to apprehend this suspect. There is truly only one question for the court to decide in this case. If an innocent person's property is destroyed by the police for the public benefit of apprehending a suspect, is that person entitled to just compensation under the Fifth Amendment of the U.S. Constitution and the Colorado Constitution as well, or should that person be forced to bear the burden of actions taken for the benefit of the public? Do you view this as a permanent taking, then, as opposed to a temporary physical invasion? Yes. I can get into that a little further. Right now, this is a physical, per se, takings. You can do it now. Okay. All right. I would submit that it is a physical intrusion, and that alone makes it a takings, regardless of the character of the intrusion. Also, under other jurisprudence in the Fifth Amendment, the all economically viable use of the property was destroyed as a result of the actions of the police. The home was declared uninhabitable. And that's where I just want to clarify. At least it was my understanding there are two sort of rubrics you can operate under. You can say this is a permanent physical taking, or by virtue of being a temporary physical invasion, and then that would implicate a test that you would have to do, a legal test. And so what I'm trying to get at is, are you saying that this home was completely taken, such that there was no need for us to engage in this legal test? Well, the home itself was completely taken in the sense that it was completely destroyed. Okay. All that remained was a piece of property with rubble on it. If there is no compensation as a takings in circumstances such as this case, when we are talking about people actually being left homeless because of the decisions of the police, how does this fit within our framework of justice and fairness, that the police can destroy someone's home and leave an innocent person to bear the cost of that decision, rather than that cost being imposed on the public as a whole? In this case, the home was completely destroyed. It was declared uninhabitable by the city. There is no question that nobody could live there. It left three people without their residence. They had almost all of their personal property destroyed. And this is all the result of 135 chemical munitions, in other words, being used on the home, all to apprehend this suspect. Within the scope of your action was a suit against the city of Greenwood Village, right? And then also against the individual officers. Am I correct on that? Correct. And let's assume, let's just assume for the moment, that you were successful as it relates to the municipality, the court entered judgment against you as it relates to both. What would happen, what would that disposition look like? I mean, would the court, should the court have an opportunity to determine whether the individual officers should receive qualified immunity or not? You're asking if this court should make that determination? No, I'm asking in our remand, should the remand be to allow the individual officers to pursue qualified immunity? In other words, well, I guess one could frame it this way. You're not asking us to rule on the qualified immunity determination as it relates to the individual officers, right? No, we are not. And that was never determined by the U.S. District Court, so it's not an issue that's up on appeal. But if you were to prevail as it relates to the city, it would be an issue in further proceedings, right? Correct. I think that would be the fair way to do that is remand it for further proceedings on that particular issue since that issue has not been addressed. Okay. Why isn't this an exercise of police power, which seems to be pretty clearly to fall within that general area? Why isn't that? And we said in Lamb that an exercise of police power is for the public good, and we distinguish that from the public use. What makes this case different? Sure. And to first answer that question, I think it's good to discuss public use and the definition of that. Public use in the Fifth Amendment has been broadly defined as a public purpose, and the U.S. Supreme Court has been very clear that this is a very expansive definition to cover an evolving needs of our society. And, you know, you look to cases like Kelo, you know, we're talking about the public purpose in that case being economic development. So public purpose has been expanded beyond just traditional eminent domain proceedings that I guess more directly benefit the public like a road. Public purpose has been held to be a much more expansive benefit to the public. But here we're talking about police power. Sure. And I'd like you to confine it to those cases discussing police power and the fact that the police exercise that power for both the public good as well as, in this case, the good of the individual owner, presumably. Sure. In fact, their nine-year-old boy was in the house, right, at least at the beginning. He was. He left of his own volition before the police even really got involved. But do you see what I'm asking you to focus on is the police power? Yes. So you raised a really good question because the U.S. District Court following Customer, that case in California, set up this sort of false dichotomy between the police powers in eminent domain. But this is a very myopic black and white way to look at things, which the U.S. Supreme Court has not done. The exercise of police powers and eminent domain and its corollary, inverse commendation, and also, of course, regulatory takings. We're all talking about exercises of police power here. So can police powers, to that point, can police powers, the exercise of police power result in a taking? Is there an exception for the taking doctrine for exercises of police power? Well, all kinds of takings result as a result of the police powers being exercised. Well, police power is not always exercised in a taking situation, is it? Not necessarily. It can be exercised through eminent domain proceedings, which you can argue one way or another are a police power. And takings can be accidental, where the state was exercising, let's say, it built a dam, so it was police powers to regulate water usage or whatever the circumstance happened to be. The dam broke, it flooded land, destroying its use. That's also a taking, too, even though it was an accidental consequence of government action. Well, government action doesn't always equal police power, right? Yes, not necessarily, because the police powers are generally the powers of state and local actors to act. And more specifically, aren't police powers generally the province of the legislature or the legislative body in promulgating rules that would govern health and safety and the like? Isn't that what we think about when we talk about an exercise of police power? And that is the definition of the police powers, to pass laws that regulate the use of property. That is the traditional example of police powers. But we're not talking about regulating property here. We're talking about a decision by one government employee to destroy property because he thought it, quote, was enforcing the law. So we're not talking about the police powers in the sense here that the legislature passed laws that regulate the use of property and can even destroy the value of that property. We're talking about an expanse of the police powers to include that police can decide to take any action they desire if they think it, quote, furthers enforcing the law. There's the big difference between the police powers that the U.S. District Court was talking about here to, quote, enforce the law in what we would normally think about as police powers in terms of being able to regulate property or even destroy it because it's a nuisance. So this has been an unseen expansion of the police powers that property can be destroyed in the name of enforcing the law. Did I answer all of Your Honor's questions in all of that? Yes. Okay. So one of the key issues in this case is the public policy implications of this decision. That's been a large focus of this, and I imagine it interests Your Honors the most. So there was a lot of apocalyptic predictions, you know, that officers are going to die if we allow just compensation in circumstances like this, that cities are going to be financially bankrupt. But we only need to look to Minnesota or Texas to know that this is not true, that this hasn't happened. This rule of law that people must be justly compensated in these circumstances has existed in Texas since 1980, in Minnesota since 1991, and the sky has not fallen. We had an amicus brief warning, like, oh, officers are going to put property ahead of lives if they have to pay just compensation. Well, we have no evidence that that has actually ever happened, even though this has been law in two states for dozens of years. So, curiously, the defense argues that all things being equal in this exact same situation, if the city had to pay for the damage, the police would be, like, so concerned that the city's money would be spent that they would actually put officers' lives at risk. This just simply doesn't make sense. You would put lives at risk to save city money, but you wouldn't put lives at risk to save... I'm sorry, that's a bad way to phrase it. Would officers actually be more concerned with saving the city money such that they would put officers' lives at risk? This runs against the whole theme the defendants have propounded in this case since the beginning, that lives are more important than property. Nobody has ever argued in this case that lives should be expended, used up, for the sake of saving property. Nobody has ever made that argument. The only thing we're arguing here is that if the police deem it necessary to destroy property to apprehend a suspect, then they should have to compensate the individual innocent, being key, homeowner, so he does not have to bear that entire loss for something that was done for the benefit of the public as a whole. Keep your eye on your own time. It's up to you. Told that the takings occurred in this case would not stress the city financially. Just to illustrate, Greenwood Village, which is a small municipality, has a yearly budget of about $48 million, 23 of which is discretionary. And in their city budget that they published in 2016, they said, although the outcome of the lawsuits cannot be predicted with certainty, it's management's opinion based on consultation with legal counsel and that the potential claims against the city resulting from such litigation would not materially affect the financial statements of the city. This is clearly a spurious argument on the part of Greenwood Village that they would be so concerned with the city's bottom line if they had to pay for these kind of incidences that they would put officers' lives at risk. You'd certainly never make this argument in an excessive force case that Fourth Amendment rights should be violated, that police should not have to use restraint in arresting people because of the cost of lawsuits. 1983 lawsuits for excessive force and Fourth Amendment violations are expensive. Thank you. Thank you. Good morning. May it please the Court. My name is Andy Nathan, and along with Ashley Hernandez Schlegel, my partner, we represent the city of Greenwood Village. This case deals with a simple question, but a very important one. Whether the takings provisions of the Colorado federal constitution mandate an award of compensation in an emergency police situation where lives are at stake but property is ultimately damaged. With the exception of the Steele and Wagner cases decided upon state constitutions and upon policy, the case law has consistently answered that question in the negative. Why? Well, first, police powers, especially in an emergency situation, take precedence over eminent domain. The case law has been clear on that. Well, what do you mean when you say police power? Police power, I gather that you're equating police power with police doing something. That's not what the law is, is it? That's not when the Supreme Court has talked about police power, that's not what they're talking about, is it? Well, there's police powers that you can say are regulatory, but we're talking about emergency police powers where there is an emergency and the police go in and they have to make decisions that are life and death decisions. We're saying property is not in the mix of that. That's why condemnation or takings law is not applicable to this situation. If the government takes property, why isn't it applicable? Because there's an exception when the government takes property for the purpose of an emergency police situation. Well, emergencies generally aren't... Well, talk to me about what your conception is of what the case law defines to be an emergency exception. What does that look like? Well, an emergency exception is when lives are at stake. This is an emergency exception. As the district court found, this wasn't even close to the line because we're dealing with a gunman who has attempted to harm or kill police officers. The police have done a sequential use of force trying to get him out of the house, which incidentally, as is pointed out, benefits the lex, too, because I don't think they want an armed gunman in their house. And so they do a sequential use of techniques. Well, that's an interesting point. Doesn't the case law speak of imminent and impending threat, so pressing that it does not omit a delay? Well, there was delay here. You incrementally did things and then decided to tear the house apart, right? Well, I understand that, Your Honor, but the point is that there is an emergency situation when you have a gunman in a house who can fire down upon police officers, who can fire at vehicles on I-225 that are passing, who can fire at neighbors who are sheltered in place for a long period of time. I don't think you need a Chicago fire to call this an imminent emergency. It is an imminent emergency. We have someone here who is trying to kill people. How long did the standoff last? Nineteen hours. Okay. That stretch is imminent to me. How is that imminent? Well, if the police can't take these incremental actions, how are they going to end this situation? The point is that when they went in the first time, they were shot at. Now, the way the police handled this was ultimately to create sight lines so that it moved the suspect to a corner of the house. He could not ambush them from there. And had he come out with a suicide by cop last stand, the snipers could have shot him. But the point is that they moved him into that one little spot. They knew that he couldn't be ambushed, and then they went in and took him. And he still resisted, but they saved the potential of police lives. At least I don't understand the argument of the appellant to be criticizing the police action. The question is just whether you pay for it. I mean, in all of these takings cases, one can debate whether the government did a good thing. I mean, they had a public use. I did a good thing. Wonderful. Pay for it. So that's what we're talking about here, right? I look to this Court's decision in Lamb v. Volpe, which says police powers should not be confused with eminent domain because under police powers, property can be damaged and compensation is not owed. You follow that up with Bennis v. Michigan, which says the government may not be required to compensate an owner for property, which it is already lawfully acquired under the exercise of governmental authority, other than the power of eminent domain. Every single police action can be said to be for the public use. That's not the question here, is was it for the public good, and is there a distinction? And the difference is that the police actions here concern public welfare, not public use. They didn't take the house. They didn't use the house. The LECs didn't donate this property for the public good. It didn't enrich the city. It didn't enrich the residents of the city at the expense of the LECs. The actions taken by the police were incidental to the termination of dangerous criminal activities, and both the LECs and the public benefited from these. So you're saying that there's a distinction between public use and what took place here? Absolutely. Okay, and what's the predicate for that? I mean, what legal predicate do you have? Public use generally means public purpose, doesn't it, consistent with what a felon said? The difference between this and eminent domain law is that they did not take the house for the use of the public. They took the house for the public welfare, and I distinguish between those two things because otherwise every time a police officer utilized force or fired a weapon that might actually hit some piece of property, they would be liable. There's at least dozens of cases that say, yes, we have cases where we take property under the police powers for forfeiture, even though they're an innocent party. We take police powers under seizure. There's the Maristar case. It's a perfect example. An innocent party took the drugs under a seizure, held them for evidence, and let them expire, and never used them as evidence. There's damage caused in arrest warrants. There's damage caused in search warrants. There's damage caused when police stop a high-speed chase, which is very dangerous by using a pit maneuver. There's potential damage every time there's a fire. If someone gets to say, well, you came in and you stopped the fire, but you created more damage than was necessary, then it's a taking. The point is that the law, as I understand it, has been very clear that these things are not takings. Now, plaintiffs say- Well, every bit of damage is clearly not a taking, but if you destroy somebody's house such that it is uninhabitable, we're talking about a different animal, are we not? Well, the courts have never decided whether or not imminent domain law is applicable based upon the amount of damage done. As a matter of fact, they've declined to do that. That's not a factor. This argument seems to be setting up a dichotomy, which your appellant suggests is false, and I'm having a hard time understanding why that's not an apt description between imminent domain law and what took place here. Why isn't any regulatory or other action by a body, by governmental action, why can that not result in a taking, whether you're talking about it in the context of imminent domain or not? I mean, if here you had resulted in taking property and you did it for a public purpose, why can that not be a taking? I mean, imminent domain aside. Okay, and once again, I distinguish public purpose and public use, because in this case they did not take the property and keep it. It did not benefit them. They used their discretion to apprehend a dangerous criminal. What's your best case for the distinction you're drawing? I'm sorry, my best case? Yes, please. Bachman, which is a 2017 decision, which is exactly on point and which says exactly what I'm saying, and Customer, which is a California case, which distinguished Steele and the Minnesota case. Both of them involved exact sorts of things. Police having to take a dangerous person out of a place of business where the owner is innocent of any wrongdoing, and both of them said this is not a taking. This is a police action, and this is the distinction that they make, and they make it fairly clearly. So unless we're going to say to the police you've got to add something in the mix, especially if you're in a small department, you've got to decide whether or not you want to take an action that destroys property but saves lives, or whether or not you should be concerned and throw the property issue in the mix. In this case, as you point out, it's 19 hours. What was left to do except to try to take this person into arrest, and the way to do it safely was done. It wasn't just the commander of Greenwood Village. He had with him two fellow SWAT officers, one from Aurora, one from Arapahoe County, who both consulted with him and agreed this is the way we have to proceed. And yes, I agree that sometimes people have to bear the burden, but as the Bachman case said, there are memorials to people in this country who have to bear the burden because we are at war or because... I don't see that analogy, the war, to be a very helpful one. That doesn't do anything for us. We're talking about the fact that when you take property, why should one individual experience the cost, the full cost, of the taking of that property when it was for a public purpose? You can use whatever language you want. Police were trying to capture an armed criminal or a dangerous criminal. It not only would benefit the Lex, but it would benefit the public. So why should the Lex be the ones that pay the burden for that? Because we don't want police... First of all, it's not part of takings law, as I've indicated. There's only two cases that have held that. And secondly, because we don't want the police to be making policy decisions about whether or not they should be using property when they're actually exercising emergency police powers to save lives. So if in this case you say, okay, well, you've got to consider a property, then the police only have two options. One is to do nothing, and the other option is to say, okay, let's just send in another team that's already been fired on, and we won't create the sight lines, and they might be ambushed. They had other options. They were at the 19th hour. How about the 20th hour? How about the 21st hour? It's not clear to me at all that they didn't have options, and they made a decision. I'm not second-guessing that decision. I'm just saying that they made a decision they ought to pay for. Why isn't that a reasonable argument? Well, you're right. It could be 20 or 21, or it could be 48, or it could be 72. And they could starve him out. Let's go back to the examples where they do that. Police have done that, and they do that historically. Why can't they do that here? But during that period of time, as I said, he's in a position of elevation. He can fire on cars on I-225. Neighbors who are sheltered in place can be at risk. Police officers who are manning the perimeter can be at risk. So, yeah, I think that this was a difficult situation. And it happens with some frequency, as we can see in Bachman and Customer. But the point is that he's going to cause potentially harm to the public had we not apprehended him. And you can say, well, maybe he would have come out after three days, or maybe four days, or five days, or six days. He's got a house full of stuff. Maybe he wouldn't come out for weeks. The point is that we're putting people at risk, and we're doing it by deciding that we want to protect property over that. And the danger is clear. One other thing that was raised that I do want to explain is that in the reply brief, plaintiffs do argue that the 10 or 11 police officers that they sue should also be brought back into this case because the court decided qualified immunity on prong one. And I think that it's pretty clear that the clause is not clearly established. And I can't believe that that argument could be made, that the law is clearly established, so it would just be a remand for the purpose of having them dismissed under prong two of qualified immunity. Well, going back to that point, whether you can imagine or not, if the court didn't pass on that issue, if they were to succeed, why wouldn't it be appropriate on remand for the court to take up the question of whether they should get qualified immunity? Well, they already sued using a remedy that they have, which is tort law. They've already sued individual officers using tort law. Well, they state they're using now the municipal liability under 1983, right? And why can't the officers that serve qualified immunity have to deal with that issue? Well, they certainly can. All right, then. So, I mean, you're not suggesting that if we were to remand, that we should decide that issue and say that the officers should get qualified immunity? Well, at the risk of angering you, Judge Holmes, I am suggesting that. Okay. I'll take that suggestion. Thank you. Your time is up. And I think you just have a few seconds if you want to claim them. I'll pass. Thank you. Okay. Case is submitted. Thank you for your arguments.